2011 VT 14

## State of Vermont v. Brian Rooney

[19 A.3d 92]

No. 08-470

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 4, 2011

Motion for Revision Granted February 23, 2011

*Thomas Donovan, Jr.*, Chittenden County State's Attorney, *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Jeffrey Rubin*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant Brian Rooney appeals from his conviction and life sentence for aggravated murder following a jury trial. He argues that: (1) the State's failure to disclose the

Vermont Forensic Laboratory's internal validation studies violated his due process rights and deprived him of a fair trial; and (2) the trial court erred in denying his motion to dismiss the aggravated murder charge, or, alternatively, in failing to sentence him under the first degree murder statute in violation of his equal protection rights under the United States and Vermont Constitutions. We reject these arguments and affirm both defendant's underlying conviction and his sentence.

¶ 2. On October 13, 2006, police discovered the body of Michelle Gardner-Quinn, a University of Vermont student who had been missing since the early morning hours of October 7. Gardner-Quinn's body was found in a crevasse in Huntington Gorge, and detectives determined the cause of death to be a combination of blunt force trauma to the head and neck compression. The position of Gardner-Quinn's clothes as well as subsequent medical examination and forensic testing of her body and underwear indicated a sexual assault.

¶ 3. Evidence was presented at trial as to the events leading up to Gardner-Quinn's disappearance. On the evening of October 6, Gardner-Quinn and two friends went out to dinner and to several bars in downtown Burlington. At approximately 1:30 a.m., Gardner-Quinn made plans to meet up with another friend at the Ski Rack, a store located on Main Street, and she set out alone towards that location. Gardner-Quinn was unable to connect with the friend once she reached the Ski Rack. At this point, Gardner-Quinn's cell phone battery died, and she borrowed the phone of defendant, a stranger who had apparently just left a bar in the area. Gardner-Quinn made several calls from defendant's phone, but was unable to reach the friend whom she was supposed to meet. A surveillance video from a downtown store showed defendant and Gardner-Quinn walking down the street at approximately 2:15 a.m. This was the last time Gardner-Quinn was seen alive. Defendant was arrested on October 23 and charged with aggravated murder under 13 V.S.A. § 2311(a)(8) for "murder[ing] another human being while perpetrating a sexual assault."

¶ 4. Defendant was questioned multiple times about what happened to Gardner-Quinn during the early morning hours of October 7, both immediately following Gardner-Quinn's disappearance and several times subsequent to discovery of her body. Each time, he denied having any knowledge of what happened after he let her borrow his cell phone. Questioning of defendant's friends

and family, however, indicated that defendant lived approximately five miles from Huntington Gorge, where Gardner-Quinn's body was discovered, and that he was familiar with the area.

¶ 5. At trial, the State presented forensic evidence linking DNA found in sperm taken from a rectal swab of Gardner-Quinn to a DNA sample obtained from defendant. Testimony was also presented from the medical examiner, indicating that Gardner-Quinn was sexually assaulted just prior to her murder. The State also relied heavily on testimony from employees of the Vermont Forensic Laboratory, detailing the processes they used to obtain a DNA sample from sperm found on Gardner-Quinn's body and to test whether that sample matched defendant's DNA profile. Marcia LaFountain, a forensic scientist at the lab who worked on Gardner-Quinn's case, testified that the result of the DNA profiling indicated that the probability of randomly selecting an unrelated individual in the general population exhibiting the combination of DNA types found from the semen in the rectal swab and the DNA sample taken from Rooney was approximately one in 240 quadrillion.

¶ 6. A substantial portion of the trial concerned whether the sample of DNA obtained from the rectal swab — which amounted to .24 nanograms of DNA — was large enough to yield an accurate profile. The State presented evidence, in the form of expert testimony from lab technicians with significant experience in both forensic analysis and quality assurance methods associated with DNA testing, indicating that the procedures followed by the lab were consistent with both national practices and with the lab's own internal procedures. Defendant challenged the lab's techniques, and presented evidence that a larger sample size of DNA provides optimal results. Defendant also showed evidence of irregularities and mistakes in the lab's handling of other pieces of evidence in both this and other cases.

¶ 7. At the conclusion of the State's case, defendant moved for acquittal, arguing that the State had not met its burden to produce evidence upon which a jury could conclude beyond a reasonable doubt that he sexually assaulted and murdered Gardner-Quinn. The court denied the motion.

¶ 8. Prior to the close of evidence, defendant moved to dismiss the aggravated murder charge, 13 V.S.A. § 2311(a)(8). He argued that because the elements for this charge are identical to the elements for first degree murder under 13 V.S.A. § 2301, equal

protection guarantees of the United States and Vermont Constitutions entitled him to be sentenced under the charge with the lesser penalty. Thus, defendant argued, he was entitled to sentencing under 13 V.S.A. § 2301, which carries a punishment of thirty-five years to life, 13 V.S.A. § 2303(a)(1)(A), rather than the mandatory life sentence attached to § 2311(a)(8). The trial court denied the motion in May 2008. The trial court explicitly rejected defendant's equal protection arguments, concluding instead that although "both statutes provide different penalties for identical conduct, this is exactly the situation that the [United States Supreme Court] considered when it unanimously held that overlapping criminal statutes with different penalties do not violate constitutional principles unless the prosecutor selectively bases the charging decision upon impermissible considerations."

¶ 9. Following trial, a jury convicted defendant of aggravated murder. In July 2008, defendant moved for a new trial, arguing: (1) the trial court erred in failing to submit lesser-included offenses to the jury; and (2) the State failed to produce "critical exculpatory information" pursuant to Vermont Rule of Criminal Procedure 16(b)(2). With regard to the first claim, defendant argued that the court erred in denying his request that the lesser-included offenses of second degree murder and sexual assault be included in the jury instructions. The trial court rejected this argument, concluding that "there was no evidence that Defendant murdered Michelle Gardner-Quinn apart from the evidence that he had sexually assaulted her[;] [t]herefore, no rational jury could find that Defendant committed the murder unless it also concluded that he had committed the sexual assault."

¶ 10. On the second claim, defendant argued that because the DNA sample linking him to the sexual assault of Gardner-Quinn was the critical piece of the State's case, the State had a duty to disclose validation studies setting forth the procedure the lab is supposed to use to generate reliable DNA profiling results. Defendant claimed these validation studies, obtained after trial, showed that the State's expert provided false assertions about the lab's ability to generate reliable DNA profiles with .24 ng of DNA input. The State denied that the studies were exculpatory, but the court rejected the claim on other grounds, holding instead that under the standard articulated in *Brady v. Maryland*, 373 U.S. 83 (1963), defendant had adequate knowledge of the existence of these studies and could have requested them prior to trial.

¶ 11. Defendant raises two claims on appeal: (1) the State violated its constitutional obligations under *Brady* by failing to disclose exculpatory evidence in the form of validation studies that would have impeached the reliability of the State's DNA evidence; and (2) he is entitled to a new trial, or alternatively new sentencing, because his conduct is punishable under two statutes with identical elements and differing sentences, and such a statutory scheme violates equal protection guarantees under the United States and Vermont Constitutions.

.I.

¶ 12. Defendant claims that he was denied a fair trial and due process of law as the result of the State's failure to disclose the Vermont Forensic Laboratory's (VFL) internal validation studies, which defendant obtained through a motion for post-trial discovery. He contends that the studies showed that the .24 ng of DNA input lab technicians were able to obtain from semen found in a rectal swab of Gardner-Quinn was well below the range that yielded accurate results in the lab's validation studies.[1] He argues that the studies would have served to impeach the State's DNA evidence linking defendant to the crime and, thus, disclosure was required under *Brady*. See also V.R.Cr.P. 16(b)(2) (requiring prosecutor to "[d]isclose to defendant's attorney any material or information within his possession or control which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce his punishment therefor"); *State v. Gibbons*, 146 Vt. 342, 344, 503 A.2d 540, 541 (1985) ("Impeachment evidence, as well as exculpatory evidence, is under the protective umbrella of *Brady*."). Because we agree with the trial court that the existence of these

---

[1] For any DNA analysis, a sample is taken from virtually any cell type (e.g., blood, hair, skin, semen) in a process known as extraction. The sample is then subject to "short tandem repeats" testing in a process known as capillary electrophoresis, in which a sophisticated DNA profiler kit is used to analyze the DNA sequences at thirteen different loci along the DNA. The sequences found at these thirteen loci is a person's DNA profile. The amount of sample used for these processes is important because, as VFL scientists testified, "[i]f you put too much in it will overwhelm the reaction and you don't get a nice pretty profile. If you don't put enough DNA in then you're simply not going to get a result and you may not get a complete profile." Internal validation studies, which are lab specific demonstrations of the proficiency of the DNA profiler kit, are especially important because they include a recommended range of input DNA sample (i.e., the optimal quantity of DNA needed for accurate DNA testing).

studies was previously disclosed in discovery and defendant failed to request them, defendant cannot meet an essential element of the *Brady* test — that the State suppressed evidence.

■ ■ ¶ 13. In *Brady*, the United States Supreme Court announced that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The purpose of this rule is "to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982). There are three elements of a *Brady* violation: "(1) the State must have suppressed evidence; (2) that evidence must [have been] favorable to the defendant because it [was] either exculpatory or impeaching; and (3) the defendant was prejudiced as a result." *State v. LeClaire*, 2003 VT 4, ¶ 8, 175 Vt. 52, 819 A.2d 719 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

■ ¶ 14. A defendant who is aware of essential facts that would allow him to request the exculpatory evidence at issue, yet fails to act on that knowledge, cannot fault the State for failing to produce it. In *State v. Tester*, for instance, we concluded that no *Brady* violation had occurred, despite the State's failure to disclose a videotaped interview of the victim, when the defendant was "well aware" of the existence and contents of the interview. 2007 VT 40, ¶ 17, 181 Vt. 506, 923 A.2d 622. Because the defendant "clearly could have discovered the videotape through the exercise of due diligence," we concluded, there was no "suppression" of the allegedly exculpatory videotape. *Id.* Similarly, in *LeClaire*, we concluded that the defendant had not shown that the State improperly suppressed evidence where the prosecution failed to produce a sample of the victim's hair for DNA testing despite the defendant's request to do so because the defendant had not taken steps to request the necessary exhumation order. 2003 VT 4, ¶¶ 9-10; see also *LeRoy*, 687 F.2d at 618 ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." (citations omitted)). The State cannot be found to have suppressed evidence if the same information was available to the defendant through the use of "reasonable dili-

gence." *United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir.), *cert. denied*, 519 U.S. 868 (1996).[2]

¶ 15. Defendant's theory of the case centered on the adequacy of the DNA profiling procedures that the lab used to identify defendant as Gardner-Quinn's assailant. The basis of defendant's challenge was that the sample size of the DNA taken from sperm found in Gardner-Quinn's body was too small to yield an accurate profile. Indeed, the size of the sample was a contested point during the trial, and the jury heard much testimony from lab technicians concerning proper testing methods and validation studies.[3] The State relied on Marcia LaFountain, a forensic scientist at the lab specializing in DNA analysis. She testified as

---

[2] In another case, the United States Court of Appeals for the Seventh Circuit offered the following justification for limiting what amounts to suppression under *Brady* to evidence that could not have been discovered by a defendant through the exercise of due diligence:

> The Supreme Court has described the *Brady* rule as applying to information known to the prosecution but "unknown to the defense." . . . [I]t would be a reasonable application of this precedent to hold that the *Brady* rule does not apply to information the defense can be expected to discover. Refusing to characterize as *Brady* material information the defense can be expected to discover serves to weed out incredible claims of ignorance, to prevent sandbagging, and is consistent with a focus on actual knowledge.

*Boss v. Pierce*, 263 F.3d 734, 743 (7th Cir. 2001) (citations omitted); see also *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002) (where government afforded defense full access to hard drive of seized computer, government, in not identifying information helpful to defense contained in hard drive, did not suppress that information, as *Brady* does not require "the Government, rather than the defense, to turn on the computer and examine the images contained therein"); *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996) (*Brady* does not require "the Government to carry the burden of transcribing" sixty-five hours of intercepted conversations because the defendants "had been given the same opportunity as the government to discover the identified documents" and "information the defendants seek is available to them through the exercise of reasonable diligence" (internal quotations and citation omitted)).

[3] Indeed, defendant's attorney stated the following during his closing remarks:

> The DNA testing is not infallible, it is very fallible. It is subject to human error, chain of custody problems, contamination, lost evidence, and failure to have adequate policies and procedures. . . . In this particular case, as in any case, there are requirements for a reliable DNA test. It has to have a reliable method that complies with established guidelines. That method has to be subject to developmental and environmental validation studies. This is critical. . . . [Defendant's

to the methods of testing used in this case; the steps taken to secure an accurate result; the amount of DNA sample obtained from sperm found in a rectal swab of Gardner-Quinn (.24 ngs); and the result of the test, which indicated that the probability of randomly selecting an unrelated individual in the general population exhibiting the combination of DNA types found from the semen in the rectal swab and defendant's DNA sample was approximately one in 240 quadrillion. On cross-examination, defendant's attorney explicitly asked LaFountain whether the kits and technology used by the lab had been subject to validation studies, and she answered that they had. Defendant's attorney then questioned LaFountain about what exactly these types of validation studies entail. Next, defendant's attorney questioned LaFountain about a manual accompanying the DNA profiler kit used by the lab. The manual included reference to internal validation studies and was subsequently admitted into evidence.

¶ 16. The State also relied on testimony from Eric Buel, who has been the Director of the VFL since 1998. The State asked Buel about the kit manual, which recommended a range of DNA input sample from 1.0 to 2.5 ng, a range obviously above the .24 ng sample used in this case. Buel testified that though the manual did indeed recommend that range, "the kit components have been used successfully to type samples containing less than one nanogram." Defendant, therefore, had ample knowledge of the existence of the study. Indeed, during closing remarks, defendant's attorney tried to use the State's failure to introduce these validation studies into evidence to his advantage:

> [The prosecution] asked Doctor Buel . . . [d]oes the Vermont Forensic Laboratory have validation studies that allow it to reliably analyze samples at .24 nanograms? Yes, said Doctor Buel. And that was the end. They never produced a validation study. They never described how they validate it. They never told you what the lower limit was. They never told you if the validation study was done and they never showed you the paper. . . . These internal validation studies are critical.

_____

evidence] establishes the manufacturer's recommendations or guidelines or criteria for generating the best results with the kit that they used in this case. One nanogram to 2.5 nanograms. Take that back into the jury room.

■ ¶ 17. Indeed, everyone appears to have known of the existence of the studies, which were referenced numerous times at trial. Under these circumstances, defendant cannot meet the first *Brady* prong — that the State suppressed the validation studies. See *United States v. Pelullo*, 399 F.3d 197, 211 (3d Cir. 2005) (identifying three factors in its analysis of whether documents had been suppressed by prosecutor — "(1) the respective knowledge of the parties; (2) [defendant's] access to [evidence]; and (3) the government's representations" — and concluding that because defendant unequivocally had knowledge of existence of disputed evidence, no suppression had occurred); *United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (concluding there is no suppression where government discloses all information necessary for defense to discover alleged *Brady* material on its own); and *Elledge v. State*, 911 So. 2d 57, 64 (Fla. 2005) (rejecting defendant's *Brady* violation claim, finding, in part, that defendant failed to demonstrate that State suppressed disputed evidence because disputed evidence was mentioned several times during pretrial depositions and trial).

■ ¶ 18. The validation studies were well within the scope of what defense counsel could be expected to investigate, and we note that *Brady* "impose[s] no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed." *Pelullo*, 399 F.3d at 212. Because we conclude that defendant is unable to meet his burden under the first *Brady* prong, we need not reach the two other prongs.

## II.

■ ■ ¶ 19. Defendant also challenges his sentence as beyond the sentencing range for first degree murder on the basis that the existence of two criminal statutes with identical elements but different penalties violates equal protection. Defendant contends that this type of statutory scheme leaves a prosecutor without a principled basis on which to choose between the two identical element crimes. Such a scheme, defendant argues, is inherently arbitrary and violates the equal protection guarantees of the United States and Vermont Constitutions because there is no legitimate purpose behind the different penalty provisions attached to crimes with identical elements. Because we find no constitu-

tional impediment to having the two statutes coexist, we reject defendant's arguments.[4]

¶ 20. We begin with the contested statutory scheme. In Vermont, first degree murder is defined as follows:

> Murder committed by means of poison, or by lying in wait, or by wilful, deliberate and premeditated killing, or committed in perpetrating or attempting to perpetrate arson, sexual assault, aggravated sexual assault, robbery or burglary, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree.

13 V.S.A. § 2301. A person convicted of first degree murder is subject to punishment of a minimum of thirty-five years and a maximum term of life. *Id.* § 2303(b). In 1987, the Legislature passed an aggravated-murder statute. The statute lists eight applicable circumstances giving rise to aggravated murder, one of which is a first or second degree murder "committed in perpetrating or attempting to perpetrate sexual assault or aggravated sexual assault." *Id.* § 2311(a)(8). The punishment for aggravated murder is "imprisonment for life and for no lesser term." *Id.* § 2311(c). Defendant was charged, convicted, and sentenced under the latter aggravated-murder statute, and sentenced to the greater penalty as a result.

---

[4] The concurring opinion would avoid the constitutional issues surrounding the choice of competing statutes in this case by applying the doctrine of implied repeal. While appreciating the appeal of this approach, we conclude that the doctrine cannot be reconciled with the circumstances of this case. Repeal of legislation by implication is a disfavored judicial doctrine, and will be found only where "(a) the acts are so far repugnant that they cannot stand together, or (b) are not so repugnant, but the later act covers the whole subject of the former and *plainly shows it was intended as a substitute therefor*[]." *State v. Baron*, 2004 VT 20, ¶ 10, 176 Vt. 314, 848 A.2d 275 (quotation omitted and emphasis added); see also *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976) (observing that there are two categories of repeal by implication: where provisions are in "irreconcilable conflict," and where "the later act covers the whole subject of the earlier one and is clearly intended as a substitute . . . [b]ut, in either case, the intention of the legislature to repeal must be *clear and manifest*" (emphasis added, quotation omitted)). See generally 1A N. Singer & J. Singer, Sutherland Statutory Construction § 23:10, at 478-79 (7th ed. 2009) ("The party asserting the implied repeal bears the burden to demonstrate beyond question that the legislature intended in its later legislative action the unequivocal purpose to effect a repeal."). There is nothing on the face of the aggravated-murder statute or in the circumstances surrounding its enactment that evinces a clear and manifest intent to replace the first degree murder statute.

¶ 21. The portions of the two statutes that punish murder committed in perpetrating or attempting to perpetrate sexual assault have exactly the same elements. In other words, the State is put to the same proof if it charges first degree murder, sexual assault under § 2301 or aggravated murder under § 2311(a)(8). Both defendant and the State agree that the statutes proscribe identical conduct, and that only the penalties differ.

¶ 22. Much of the parties' briefs focus on whether the legislative history of the later enacted aggravated-murder statute demonstrates that the Legislature intended to grant prosecutors the discretion to choose which penalty for murder should be applicable. Defendant points to statements made during House Judiciary Committee meetings, which he maintains indicate that at least some members of the Committee mistakenly believed sexual assault first degree murder to be a lesser-included offense of aggravated murder. The State appears to concede this misconception, but argues that the Legislature also intended to afford the prosecution a choice of two penalties for murder committed during the perpetration of sexual assault. Thus, the legislative history cited by each party — which seems to point in opposite and inconsistent directions — offers no help in resolving the underlying question of whether, even if the Legislature intended to allow the prosecutor to charge under either statute, such a statutory scheme is constitutional.

¶ 23. Defendant offers the same constitutional challenge under both the Federal and State Constitutions, contending that there is no rational basis for enacting identical criminal statutes with different penalties. The seminal case with regard to treatment of identical or overlapping elements in criminal statutes under the Federal Constitution is the United States Supreme Court's decision in *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979). Writing for a unanimous court in *Batchelder*, Justice Marshall found no constitutional impediment to a statutory scheme that permitted prosecutors to elect between offenses having identical elements but different penalties. Both of the statutes in that case prohibited convicted felons from receiving firearms but each carried different penalties. The defendant argued that he was entitled to be sentenced under the more lenient provision even though his conduct violated both statutes. The Supreme Court disagreed. The Court first rejected the claim that the provisions were void for vagueness, concluding that they "unambiguously

specify the activity proscribed and the penalties available upon conviction." *Id.* at 123. According to the Court, "[a]lthough the statutes create[d] uncertainty as to which crime may be charged and therefore what penalties may be imposed, they d[id] so to no greater extent than would a single statute authorizing various alternative punishments." *Id.*

¶ 24. Next, the Court addressed the defendant's due process and equal protection claims under the Fourteenth Amendment. The Court noted that it had "long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Id.* at 123-24. The Court held that providing prosecutors with such a choice does not empower the executive branch to "predetermine ultimate criminal sanctions," but "merely enables the sentencing judge to impose a longer prison sentence than [the lesser penalty statute] would permit." *Id.* at 125. Thus, the Court rejected the claim that the statutory scheme delegated to the executive branch the Legislature's responsibility to attach certain criminal penalties to certain crimes. The Court found instead that because the provisions clearly set forth the range of penalties that prosecutors and judges may seek and impose, "the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing criminal laws." *Id.* at 126.

¶ 25. The Court further stated:

> More importantly, there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment

and prosecution, neither is he entitled to choose the penalty scheme under which he will be sentenced.

*Id.* at 125 (citations omitted).

 ¶ 26. Because the circumstances in this case are indistinguishable from those in *Batchelder*, the broad holding of *Batchelder* forecloses defendant's requested relief under the Fourteenth Amendment. Our inquiry does not necessarily end with *Batchelder*, given defendant's claim that the Vermont Constitution offers him a higher level of protection.[5] We note, however, that most states have embraced the reasoning in *Batchhelder*. See *Hart v. State*, 702 P.2d 651, 662 (Alaska Ct. App. 1985) (noting that "majority" of courts have followed *Batchelder*); *Johnson v. State*, 2003 WY 9, ¶ 33, 61 P.3d 1234 (following *Batchelder* along with "[m]any of our sister jurisdictions"). Those that depart from *Batchhelder* struggle, unnecessarily from a constitutional standpoint, with two issues. The first one is whether the two statutes at issue have identical elements. See, e.g., *People v. Marcy*, 628 P.2d 69, 80-81 (Colo. 1981) (en banc) (holding that culpable mental state required under statute prohibiting first degree murder by extreme indifference was not sufficiently distinguishable from second degree murder to warrant substantial difference in penalty authorized by statutory scheme); *State v. Williams*, 2007 UT 98, ¶¶ 16-18, 175 P.3d 1029 (noting "need to

---

[5] The State cites *State v. Shippee*, 2003 VT 106, 176 Vt. 542, 839 A.2d 566 (mem.), for the proposition that we have adopted the equal protection analysis announced in *Batchelder* for both overlapping and identical statutes. In *Shippee*, we addressed a defendant's claim that he was subjected to arbitrary and discriminatory enforcement because he was charged with a felony for lewd and lascivious conduct under 13 V.S.A. § 2601 instead of a misdemeanor under 13 V.S.A. § 2632. We rejected the defendant's claim, holding that "[w]hen there are overlapping criminal offenses with which a defendant could be charged based on the facts, it is within the prosecutor's discretion to choose among them." *Id.* ¶ 7. Though *Shippee* applied the *Batchelder* constitutional jurisprudence to the facts of that case, our decision did not include any extended discussion of the elements of the two crimes. Notably, the decision did not address whether the crimes were identical or the effect of this distinction on the analysis. In fact, *Shippee* does not control our resolution of the present case because there is an additional element in the lewd-and-lascivious conduct felony charge not present in the misdemeanor charge. See *State v. Perry*, 151 Vt. 637, 641, 563 A.2d 1007, 1010 (1989) ("It is within the prosecutor's discretion to determine which overlapping criminal offenses established by the facts should be charged, and we will not interfere with the exercise of this discretion without a statement by the legislature that such an infringement is intended.").

perform the close dissection of statutory language" to determine whether elements of two statutes were sufficiently similar to create constitutional violation). The second issue is whether the severity of the disparity between the penalties in the two statutes should be a factor in deciding *Batchelder*'s applicability. See *Marcy*, 628 P.2d at 74 n.5 (distinguishing *Batchelder* by noting "substantial differences in both the minimum and maximum terms of confinement for the two crimes" under consideration); cf. *Hart*, 702 P.2d at 662 (following *Batchelder* "at least to the extent that a defendant challenges two felony statutes"); *Johnson*, 2003 WY 9, ¶ 31 (noting that even those commentators questioning *Batchelder*'s logic suggest that level of disparity between statutory penalties could be factor in determining whether constitutional violation exists).

¶ 27. Apart from his inability to distinguish *Batchhelder*, defendant offers little in the way of explaining why the Vermont Constitution compels a different result from that held by the Court in *Batchelder*. Defendant does make a brief argument under the Common Benefits Clause — one amplified and expanded by the dissent.[6] Indeed, the dissent concludes, entirely gratuitously, that the challenged statutory scheme violates the Common Benefits Clause of the Vermont Constitution by creating two classes of similarly situated individuals — those charged with felony murder and those charged with aggravated murder — based on unfettered and standardless prosecutorial discretion. The underlying premise of this Common Benefits analysis — that the statutory scheme at issue unconstitutionally creates two classes of similarly situated individuals — is faulty.

¶ 28. The Common Benefits Clause "is intended to ensure that the benefits and protections conferred by the state

---

[6] This issue was not, in any event, properly preserved. Defendant presented no argument under the Common Benefits Clause before the trial court. Rather, defendant merely declared, without reasoning or any attempt to distinguish federal law, that the prosecutorial discretion afforded by the two murder statutes violated the Vermont Constitution, Chapter 1, Articles 4 and 10. See *State v. Brillon*, 2010 VT 25, ¶ 6, 187 Vt. 444, 995 A.2d 557 (declining to reach state constitutional issue where defendant cited Vermont Constitution at trial but did not provide any substantive analysis of how constitutional claim should differ under Vermont Constitution in comparison to Federal Constitution). On appeal, defendant relegates his Common Benefits argument to a few pages at the end of his sixty-page brief.

are for the common benefit of the community and are not for the advantage of persons 'who are a part only of that community.' " *Baker v. State*, 170 Vt. 194, 212, 744 A.2d 864, 878 (1999) (quoting Vt. Const. ch. I, art. 7). When we consider a constitutional challenge under the Common Benefits Clause, we must first define the part of the community disadvantaged by the law by examining "the statutory basis that distinguishes those protected by the law from those excluded from the state's protection." *Id.* at 212-13, 744 A.2d at 878. According to the dissent, the statutory scheme challenged here creates two classes of similarly situated persons — those charged with felony murder and subject to a thirty-five-years-to-life sentence and those charged with aggravated murder and subject to a mandatory life sentence. But the statutes themselves do not treat any particular individuals or classes of individuals differently. We are all equally subject to the same legislatively conferred prosecutorial discretion to proceed under either statute as the circumstances may seem to justify in a given case. Defendants accused of murder during the course of a sexual assault are nowhere deemed or recognized as a protected class, and the risk that one prosecutor may pursue a mandatory life sentence while another may file for a more discretionary sentence in the event of different homicides arising from sexual assault is of no constitutional concern unless the choice results from impermissible racial, ethnic or gender biases. *Batchelder*, 442 U.S. at 125 n.9.

¶ 29. Just as a defendant has no constitutional right to elect the statute upon which he will be prosecuted, "neither is he [constitutionally] entitled to choose the penalty scheme under which he will be sentenced." *Id.* at 125. As the Supreme Court stated, "[t]he prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause." *Id.* The authority to charge aggravated murder in this case, rather than felony murder, is of no more practical concern than the unfettered and broad discretion exercised daily by Vermont prosecutors. Certainly, on the record of this case, which fails to reflect any discriminatory treatment, it is of no constitutional concern either. State's attorneys may elect, solely at their option, to file felony charges against defendants when the facts equally support mere misdemeanors, and may freely choose to charge multiple offenses, compatibly with the evidence, with

potentially stacked sentences instead of seeking a limited sentence based on a single charge.

¶ 30. Setting aside, for argument's sake, the option of aggravated murder in this case, the State's remaining choices in charging defendant ranged from simple assault to sexual assault to felony murder, with respective penalties ranging from one year, 13 V.S.A. § 1023(b), to three years to life, 13 V.S.A. § 3252(f)(1), to thirty-five years to life, 13 V.S.A. §§ 2301, 2303(b). Virtually unlimited prosecutorial discretion in charging decisions is no stranger to our law, and is entirely consistent with our Constitution. See *Shippee*, 2003 VT 106, ¶ 7 ("When there are overlapping criminal offenses with which a defendant could be charged based on the facts, it is within the prosecutor's discretion to choose among them."). Against this backdrop, we decline to hold that yet another unfettered charge option presents an unconstitutional infringement of defendant's fancied and suddenly emergent right to fettered prosecutorial discretion. We are not bothered by the dissent's point that the discretion to choose between criminal statutes with differing elements "necessarily involves considerations of proof, strategy, resources, and overall law enforcement objectives." *Post*, ¶ 50. Law enforcement policy, strategic leverage and resource allocation issues do not evaporate for state's attorneys choosing to pursue one statutory penalty over another for a charged offense.

¶ 31. The dissent's reasoning implies that all conduct chargeable under statutes with identical elements but differing penalties is indistinguishable to the extent that there can be no constitutionally supportable basis for the State to seek prosecution under one statute rather than the other. We will not rely upon such a fiction to trump the Legislature's unambiguous intent to allow prosecutors to seek a mandatory life sentence for those who murder during the course of a sexual assault. Criminal misconduct often involves individual circumstances that could legitimately support a prosecutor's decision to proceed under one statute rather than another, regardless of whether the elements of the statutes are the same. One murder in the course of a sexual assault might be particularly heinous because of the nature of the assault or the defendant's state of mind, while another might be less so.

¶ 32. Ultimately, as the Supreme Court reasoned in *Batchelder*, a prosecutor's considerations in deciding which statute

to proceed under will be similar regardless of whether the statutes being considered have identical or disparate elements. This reasoning "recognizes the critical role of prosecutorial discretion within our system of law in maintaining flexibility and sensitivity." *State v. Pickering*, 462 A.2d 1151, 1160-61 (Me. 1983) (adopting *Batchelder* reasoning in rejecting constitutional challenge to statutory scheme that allowed prosecutors to proceed against persons charged with drunk driving under criminal or civil statutes. with same elements but varying penalties).

■■ ¶ 33. In the case of murder committed during a sexual assault, our Legislature has determined to leave to the prosecutor the discretion to seek a mandatory life sentence. To the extent that the resulting law permits the prosecutor to effectively circumscribe the trial court's discretion in determining the length of a defendant's sentence, there is no constitutional violation. "[D]efendant has no due process right to have a judge determine his or her sentence and, accordingly, a legislature may constrain or eliminate altogether the role of judicial discretion in the sentencing process." *Ehrsam v. Rubenstein*, 917 F.2d 764, 767 (3d Cir. 1990). By the same token, "[i]t is also well settled that a legislature can exercise its right to limit judicial discretion in sentencing by bestowing on prosecutors the right to make decisions that may curtail judicial discretion." *Id.* Accordingly, the Vermont Legislature has mandated certain outcomes for certain offenses upon conviction, rather than leave the consequences to judicial discretion. See, e.g., 13 V.S.A. § 3253a(b) (providing that person convicted of aggravated sexual assault of child shall be imprisoned for not less than twenty-five years without possibility of suspension, deferral, or supervised release).

■ ¶ 34. As long as prosecutors exercise discretion in a manner that does not arbitrarily discriminate against an individual or class of individuals based on impermissible criteria such as race or religion, the State's discretion is not limited by any constitutional provision or principle. *Batchelder*, 442 U.S. at 125 n.9; *State v. Secrest*, 331 N.W.2d 580, 583 (S.D. 1983) (noting that *Batchelder* "recognized the long-standing rule that when an action violates two criminal statutes, the government may prosecute under either, providing that it does not discriminate against any class of defendants"). While we may argue in the abstract that prosecutorial discretion is unfettered when choosing between

statutes with identical elements, this is, again, practically indistinguishable from prosecutorial discretion in choosing between statutes with different elements. In either case, there is no constitutional basis, to challenge prosecutorial discretion in the absence of unlawful discrimination or some other actual and articulable abuse of discretion.

*Affirmed.*

¶ 35. **Skoglund, J.,** concurring. I concur with the majority's constitutional analysis and its mandate, but I would avoid the constitutional question and hold that the Legislature, in enacting the aggravated murder statute, impliedly repealed that part of the felony murder statute related to sexual assault. See, e.g., *State v. Bauder*, 2007 VT 16, ¶ 27, 181 Vt. 392, 924 A.2d 38 ("It is, of course, a fundamental tenet of judicial restraint that courts will not address constitutional claims . . . when adequate lesser grounds are available."); see also 4 W. LaFave, et al., Criminal Procedure § 13.7(a), at 259 (3d ed. 2007) (concluding that courts may avoid constitutional issue addressed in *Batchelder* "by utilizing canons of statutory construction, such as that a later statute should prevail over an earlier one with which it would otherwise overlap, or that the more specific statute should prevail over the more general one with which it would otherwise overlap").

¶ 36. The felony murder statute has been on the books since 1869 and has remained the same since at least 1947, except for a 1983 amendment that substituted the words "sexual assault, aggravated sexual assault" for the word "rape." 1983, No. 28, § 1. In 1987, the Legislature passed the aggravated murder statute listing eight circumstances that give rise to aggravated murder, including murder "committed in perpetrating or attempting to perpetrate sexual assault or aggravated sexual, assault," 13 V.S.A. § 2311(a)(8) — which is also one of the circumstances for felony murder under the older statute. I agree with the trial court that the Legislature was plainly aware of the felony murder statute and yet chose in 1987 to redefine murders committed while perpetrating sexual assault as aggravated murders. Such a conclusion best implements the legislative intent, given the nature and timing of the statutes in question. Accordingly, I would hold that the Legislature in 1987, with its enactment of the aggravated murder statute, impliedly repealed the sexual assault component of the felony murder statute.

¶ 37. While we may not presume repeal by implication, we "will" conclude that a statute has been impliedly repealed by another act if "(a) the acts are so far repugnant that they cannot stand together, or (b) are not so repugnant, but the later act covers the whole subject of the former and plainly shows it was intended as a substitute therefore." *State v. Baron*, 2004 VT 20, ¶ 10, 176 Vt. 314, 848 A.2d 275 (quotation omitted). I agree with the *Batchelder* Court that two statutes are not mutually repugnant merely because they produce differing results when applied to the same factual situation, 442 U.S. 114, 122 (1979), but I would conclude in this case that even though the statutes are not so far repugnant, the later aggravated murder statute covers the whole subject of the relevant part of the felony murder statute — murder perpetrated during a sexual assault or aggravated sexual assault — and the timing and specificity of the later statute makes the legislative intent manifest. See, e.g., *State v. Chavez*, 419 P.2d 456, 457-58 (N.M. 1966) (stating that it was "obvious" when legislature amended narcotic drug law to include marijuana that it did so with apparent intent to make it controlling over marijuana law providing for lesser penalty); see also *Cent. Vt. Hosp., Inc. v. Town of Berlin*, 164 Vt. 456, 459, 672 A.2d 474, 476 (1995) (stating that when two statutes deal with same subject matter, generally more specific and more recent provision prevails).

¶ 38. The aggravated murder statute lists all circumstances under which first or second degree murder will be considered aggravated, including during the perpetration of a sexual assault or aggravated sexual assault. Accordingly, it supplants that circumstance — but only that circumstance — with respect to the felony murder statute. I realize that various persons connected to the enactment of the aggravated murder statute in 1987 — including committee witnesses and at least one committee member — provided their particular take on the implications of having the same elements in both statutes. But, as the majority and the dissent indicate, none of this legislative history is definitive, and it certainly does not undermine the notion that the Legislature, as a body, intended to impliedly repeal the overlapping part of the felony murder statute.

¶ 39. For good reason, courts are generally "hesitant to resort to . . . statements [of the purpose or nature of the proposed law] made by committee members or other persons at the committee's hearings." 2A N. Singer & J. Singer, Sutherland Statutory Con-

struction § 48:10, at 583 (7th ed. 2007). Doing so would require one to consider what impact such statements may have made on the majority of legislators, which could be considered indulging in judicial legislation. *Id.* § 48:2, at 548 (noting Justice Robert Jackson's stated preference for making decisions by statutory analysis rather than "psychoanalysis of Congress" (quotation omitted)). Under these circumstances, the most reasonable and accurate course of action is to presume implied repeal of the overlapping part of the two statutes.

¶ 40. **Johnson, J.,** dissenting. To define crimes and fix corresponding punishments is a quintessential legislative function. To define identical crimes and affix strikingly different punishments is a perversion of that function. No just and reasonable purpose could be served by such a statutory scheme, nor, tellingly, does the majority here even attempt to advance one. "Prosecutorial discretion" to select from among different offenses for reasons related to proof, resources, or remedial objectives provides no answer to the simple question: What legitimate purpose is served by defining two identical offenses with significantly different punitive consequences? The answer, in my view, is none. Accordingly, I respectfully dissent.

¶ 41. Before addressing this issue, however, it is necessary to correct a misleading suggestion in the majority opinion that defendant's claims under the Vermont Constitution were somehow inadequately preserved. While acknowledging that we must address defendant's "claim that the Vermont Constitution offers him a higher level of protection," *ante,* ¶ 26, the majority nevertheless states that defendant's equal protection claim under the Vermont Constitution was not "properly preserved," *ante,* ¶ 27 n.6. The argument appears to have two components. First, the majority notes that defendant's motion to dismiss did not expressly cite to Article 7 of Chapter I of the Vermont Constitution, our equal-protection equivalent to the Fourteenth Amendment of the United States Constitution. This argument exalts form over substance. Defendant's motion expressly asserted that "[u]nder the Vermont Constitution, equal protection of the laws requires that statutory classifications of crimes be based on differences that are real in fact and reasonably related to the general purposes of criminal legislation and that such protection is lacking if different statutes proscribe the same criminal conduct with disparate criminal sanctions." No formal citation to Article 7 was necessary to fully

appreciate that defendant was raising an equal protection claim under the Vermont Constitution.

¶ 42. Nor is there any particular template for an adequate state constitutional argument. We have, to be sure, urged advocates to mine a variety of sources when available, including historical materials, textual analysis, "economic and sociological materials," "sibling state" decisions interpreting similar constitutional clauses, and any other arguments available to the "imaginative lawyer." *State v. Jewett*, 146 Vt. 221, 227-28, 500 A.2d 223, 237 (1985). None of these, however, is required. While mere mention of the Vermont Constitution may not suffice to preserve a claim, there is no reason in theory why a claimant may not legitimately rely on the language of the Vermont Constitution and reasoned argument for a construction different from that of the federal courts construing the same or similar language in the Federal Constitution. I say "in theory" because defendant's trial motion here, while hardly exhaustive, certainly went well beyond mere reasoned argument. Defendant relied on a number of sister-state decisions rejecting, on independent state grounds, the Supreme Court's holding in *United States v. Batchelder*, 442 U.S. 114 (1979), and a leading criminal law commentator who has criticized the high court's reasoning and argued that "[n]otwithstanding *Batchelder*, a state might well conclude as a matter of state constitutional law that equal protection of the laws" is violated where "different statutes proscribe the same criminal conduct with disparate criminal sanctions." 4 W. LaFave, et al., Criminal Procedure § 13.7(a), at 259 (3d ed. 2007) (quotation omitted). There is simply no question, therefore, that defendant's state claims were adequately preserved.

¶ 43. Turning to those claims, defendant asserts that the existence of two criminal statutes with identical elements but different penalties violates due process and equal protection because they serve no legitimate purpose and leave a prosecutor with no principled basis on which to choose between the two identical-element crimes. The majority readily acknowledges that the portions of the two statutes at issue which punish murder committed in perpetrating or attempting to perpetrate sexual assault "have exactly the same elements. In other words, the State is put to the same proof if it charges first degree murder, sexual assault under § 2301 or aggravated murder under § 2311(a)(8)." *Ante*, ¶ 21. Indeed, the State here has conceded that

"the statutes proscribe identical conduct, and that only the penalties differ." *Id.*

¶ 44. The majority nevertheless finds no constitutional infirmity in such a scheme on the strength of the United States Supreme Court's decision in *Batchelder*. There, the high court addressed a claim that the existence of identical provisions in two statutes, each of which prohibited convicted felons from receiving firearms but carried different penalties, violated a defendant's due process and equal protection rights. The defendant argued that he was entitled to be sentenced under the more lenient provision when his conduct violated both statutes. The Court rejected the argument, concluding that there was essentially "no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements." 442 U.S. at 125. Traditional prosecutorial discretion, in other words, justified any disparate treatment of offenders absent proof of selective or invidious prosecution.

¶ 45. Albeit grudgingly, the majority here recognizes that while *Batchelder*'s broad language forecloses defendant's requested relief under the Fourteenth Amendment, it does not preclude his claim under the Common Benefits Clause of the Vermont Constitution, which is distinct from the Fourteenth Amendment's Equal Protection Clause and requires a more rigorous review than the highly deferential rational-basis standard applied under an equal-protection analysis not involving fundamental rights. *Baker v. State*, 170 Vt. 194, 201-04, 744 A.2d 864, 870-71 (1999) (stating that Common Benefits Clause "differs markedly from the federal Equal Protection Clause in its language, historical origins, purpose, and development"). Rather than adopt the somewhat rigid tiered analysis employed by the federal rational-basis/strict scrutiny tests, we clarified in *Baker* that Vermont courts have a duty "to evaluate the object and effect of state laws" and to "engage in a meaningful, case-specific analysis to ensure that any exclusion from the general benefit and protection of the law would bear a just and reasonable relation to the legislative goals." *Id.* at 204, 744 A.2d at 872. Thus, the question here is whether the statutory classification bears a just and reasonable relation to a legitimate governmental goal.

¶ 46. The statutory scheme at issue obviously creates two distinct classes of similarly-situated individuals, those charged with

sexual assault first-degree murder under 13 V.S.A. § 2301 and those — like defendant — charged with aggravated murder under § 2311(a)(8), and attaches significantly different penalties to the two crimes. The majority's assertion that the legislation creates no classification because all are "equally subject to the same legislatively conferred prosecutorial discretion," *ante*, ¶ 28, ignores the plain fact that the statutes affix disparate punitive consequences to identical conduct.

¶ 47. Turning to the purported governmental purpose for the classification, the State posits "prosecutorial discretion," asserting that the Legislature intended to grant prosecutors the discretion to choose different punishments by charging under either § 2301 or § 2311(a)(8). Indeed, the State devotes much of its argument to listing the reasons why a prosecutor's discretion to charge under either murder statute is no different from the discretion to pick and choose among any applicable criminal statute, so long as the choice is not motivated by an illegal consideration, such as race or gender. The majority essentially adopts this position, finding that the discretion "to charge aggravated murder in this case, rather than felony murder, is of no more practical concern than the unfettered and broad discretion exercised daily by Vermont prosecutors." *Ante*, ¶ 29.

¶ 48. The argument is entirely unpersuasive. Prosecutorial discretion may represent a legitimate governmental goal where the prosecutorial choice involves statutes criminalizing similar but distinct behaviors, and the charging decision turns on considerations of proof, strategy, resources, and remedial objectives. But the situation here involves two classes of defendants who have committed identical element crimes and the prosecutorial choice turns on little more than whim. Indeed, to describe a prosecutor's charging decision in these circumstances as a "choice" is almost meaningless — where there are no elements of proof or other standards involved, there is simply nothing to inform the charging decision. The result offends the very core principles of our criminal justice system: fair notice to the accused and evenhandedness in his or her treatment. See *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) ("Where the legislature fails to provide such minimal guidelines [to govern law enforcement], a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." (quotation omitted)).

¶ 49. In focusing on whether prosecutorial discretion justifies any choice in charging so long as it is not motivated by impermissible considerations such as race or gender, the majority overlooks the inherent arbitrariness of the statutory scheme itself. A New York court addressing a statutory scheme that treated juvenile misdemeanants differently depending on the forum in which the charge happened to be brought explained the crucial distinction this way:

> But, prosecutorial discretion, broad and virtually unencumbered though it may be, cannot of itself provide a rational basis for a statutory classification. Prosecutorial discretion can determine in which forum a charge is brought, or the gravity of a charge, or whether a prosecution proceeds at all. Prosecutorial discretion cannot however determine the appropriate powers of a given court, or its jurisdiction, or its sentencing options, if any. The legislature does that, within parameters laid down by the constitution. For the legislature constitutionally to *mandate* a certain sentence for a certain act committed by a certain class of persons when the matter is before one court, and to provide for something different when the matter is before another court, there must be a rational basis for the distinction.

*People v. Robert Z.*, 511 N.Y.S.2d 473, 479 (Cnty. Ct. 1986) (citations omitted). The court ultimately concluded that there was no rational basis for treating offenders differently, concluding that "the guise of prosecutorial discretion" could not be used to circumvent "the rational basis for the statute's constitutional viability." *Id.*

¶ 50. The disconnect between the statutory classification and the governmental goal becomes even clearer here when the legitimate interests underlying prosecutorial discretion are examined. Consider the common scenario of overlapping (as opposed to identical) statutes with both different elements and penalties. There, a prosecutor's choice between the statute requiring proof of an additional element and the statute without that added element necessarily involves considerations of proof, strategy, resources, and overall law enforcement objectives. We have quite properly refused to judicially micromanage routine prosecutorial choices of this nature. See *State v. Wesco, Inc.*, 2006 VT 93, ¶ 11, 180 Vt. 345,

911 A.2d 281 ("Because prosecutors function as delegates of the executive, they retain broad discretion to enforce the law including — so long as probable cause is present — the decisions whether to prosecute in any given case and what charge to file."); *State v. Calhoun*, No. 92, 987, 2005 WL 3289391, at *7 (Kan. Ct. App. Dec. 2, 2005) ("When deciding to charge a crime under one of two statutes containing different elements, the prosecutor has to examine the evidence and determine under which statute the evidence falls.").

¶ 51. Such practical considerations are notably absent, however, where the "choice" involves identical-element statutes with different penalties. See LaFave, *supra*, § 13.7(a), at 256 ("Where statutes are identical except for punishment, the prosecutor finds not the slightest shred of guidance." (quotation omitted)). Indeed, as noted, in such cases the traditional justifications for affording prosecutors broad discretion literally have no application, and allowing prosecutors to "choose" between identical-element crimes solely on the basis of punitive consequences pushes prosecutorial discretion to the breaking point. The two statutes before us cannot pass constitutional muster for much the same reason that unfettered prosecutorial choices have failed in other contexts: there is no principled basis under the statutes to choose one over the other. See, e.g., *In re Miller*, 2009 VT 36, ¶ 23, 185 Vt. 550, 975 A.2d 1226 ("Although a degree of prosecutorial discretion is acceptable, we are skeptical of statutes that appear to afford the prosecution a choice of two penalties of such disparate nature." (quotations and citations omitted)); *In re G.T.*, 170 Vt. 507, 514, 758 A.2d 301, 306 (2000) (noting that despite the importance of prosecutorial discretion, "[i]t is one thing to give discretion in enforcing a legislatively defined crime; it is quite another to give prosecutors the power to define the crime"). Indeed, even assuming that the State's charging decision is made in complete good faith, it is inherently and unavoidably arbitrary where standards to govern the choice are lacking.

¶ 52. Instructively, a number of states have found equal protection violations under their own constitutions where — as here — two identical criminal statutes impose different penalties. In *State v. Campbell*, 106 P.3d 1129 (Kan. 2005), for instance, the Kansas Supreme Court addressed an equal protection claim challenging two criminal statutes prohibiting identical conduct but with different penalties — one statute prohibited knowing possession of

ephedrine or pseudoephedrine with the intent to use the product to manufacture a controlled substance while the other prohibited knowing possession of drug paraphernalia with the intent to use it to manufacture a controlled substance. The court departed from *Batchelder* and held that where two criminal statutes have identical elements but different penalties a defendant convicted of either crime can only be sentenced under the lesser penalty. *Id.* at 1139. Importantly, the court's decision was grounded on its conclusion that there was no legitimate basis for allowing a prosecutor the discretion to charge one crime over another based solely on the penalty, noting that "the prosecutor should not be given the discretion to effectively make a sentencing decision without the benefit of sentencing information or expertise." *Id.*

¶ 53. Similarly, in *People v. Marcy*, 628 P.2d 69, 74-75 (Colo. 1981) (en banc), the Colorado Supreme Court also declined to follow *Batchelder* under the Colorado Constitution and concluded that elements found in its first-degree murder by extreme indifference and second-degree murder criminal statutes were indistinguishable because each statute required an act performed knowingly resulting in death. Allowing duplicative criminal statutes to impose different penalties for the same conduct, the court observed, "irrationally discriminate[s] against an accused" and violates equal protection guarantees. *Id.* at 74. The Hawai'i Supreme Court reached the same conclusion under the Hawai'i Constitution in *State v. Hoang*, holding that where "the same act committed under the same circumstances is, by virtue of the prosecution's charging option or whim, punishable either as a felony or as a misdemeanor, under either of the two statutory provisions, precisely because the elements of proof essential to either conviction are exactly the same" equal protection is violated. 947 P.2d 360, 370 (Haw. 1997) (quotations omitted).

¶ 54. The overarching principle at stake in these decisions — as in the case before us — is simply this: that we are a government of laws and not of men. This principle is elegantly expressed in the Vermont Constitution as follows: "That all power being originally inherent in and consequently derived from the people, therefore, all officers of government, whether legislative or executive, are their trustees and servants; and at all times, in a legal way, accountable to them." Vt. Const. ch. I, art. 6. A legislative scheme that permits the State to bring criminal charges against its citizens arbitrarily and without adequate standards is a gov-

ernment not of laws, but of men. We countenance such a result at our peril.

¶ 55. Therefore, I would hold that the statutory scheme at issue violates defendant's right to equal protection of the law under the Vermont Constitution. Of course, determining the appropriate remedy for a constitutional violation of this nature presents a separate, though no less important, issue. Defendant's assertion that the charge under § 2311(a)(8) should be dismissed and the case retried under § 2301 is unpersuasive. At trial, all sides agreed that the motion to dismiss could be addressed at the end of the case because prosecution under either of the applicable statutes involved the same elements, evidence, and issues of proof and differed only as to sentence. The jury's ultimate conclusion that defendant was guilty of aggravated murder under § 2311(a)(8) is equivalent to a finding of guilt under § 2301, and that verdict should not be disturbed on appeal.

¶ 56. The more logical and appropriate remedy, rather, is to remand for a resentencing of defendant under the lesser sentencing scheme. Indeed, this is the settled rule in at least one other jurisdiction that has rejected *Batchelder* to hold that, where separate criminal statutes have identical elements but different sentencing schemes, "the decision as to which penalty to seek cannot be a matter of prosecutorial whimsy in charging." *State v. Clements*, 734 P.2d 1096, 1100 (Kan. 1987). Thus, where statutes define "identical offenses, a defendant can only be sentenced under the lesser penalty." *Id.* This rule has come to be known as the "identical offense sentencing doctrine," *State v. Reyna*, 234 P.3d 761, 780 (Kan. 2010); *State v. Thompson*, 200 P.3d 22, 33 (Kan. 2009), and provides simply that: "Where two criminal offenses have identical elements but are classified differently for purposes of imposing a penalty, a defendant convicted of either crime may be sentenced only under the lesser penalty provision." *State v. Nunn*, 768 P.2d 268, 284 (Kan. 1989).

¶ 57. The doctrine is similar to the settled "rule of lenity," although its rationale differs somewhat. The latter is predicated on the fundamental right to adequate notice of what conduct may give rise to criminal punishment, and the concomitant obligation to resolve any statutory ambiguity in favor of the accused. See *State v. LaBounty*, 2005 VT 124, ¶ 4, 179 Vt. 199, 892 A.2d 203 ("In interpreting a criminal statute, the rule of lenity requires us to resolve any ambiguity in favor of the defendant."); *State v. Oliver*,

151 Vt. 626, 629, 563 A.2d 1002, 1004 (1989) ("Penal statutes . . . are to be strictly construed in a manner favorable to the accused.").

¶ 58. Here, the ambiguity was not in the wording of the statutes or the scope of the conduct proscribed. The flaw here went deeper, to the fundamental fairness of the charging decision itself, and the inherent arbitrariness of a statutory scheme unhinged from any objective charging criteria, and circumscribed by nothing more than "prosecutorial whimsy." That is the fundamental nature of the constitutional violation in this case, and the reason why — as the Kansas Supreme Court has recognized — a defendant charged and convicted under these circumstances may be sentenced only under the lesser penalty provision.

¶ 59. Accordingly, I would remand the case to the trial court for the purpose of resentencing defendant under the first-degree murder statute.

¶ 60. I am authorized to state that Justice Dooley joins this dissent.