NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 59

No. 2020-311

| | |
|---|---|
| In re Investigation to Review the Avoided Costs that Serve as Prices for the Standard-Offer Program in 2020 (Allco Renewable Energy Limited & PLH LLC, Appellants) | Supreme Court<br><br>On Appeal from<br>Public Utility Commission<br><br>April Term, 2021 |

Anthony Z. Roisman, Chair

Thomas Melone of Allco Renewable Energy Limited, New Haven, Connecticut, for Appellants.

Alexander W. Wing, Special Counsel, Montpelier, for Appellee Vermont Department of Public Service.

PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.  **CARROLL, J.**  Allco Renewable Energy Limited & PLH LLC (collectively Allco), appeal the Public Utility Commission's (PUC) September 2020 decision awarding two provider-block contracts to Green Mountain Power (GMP).  Allco argues that the PUC erred in determining that the proposals submitted by GMP on behalf of an undisclosed independent developer were proper provider-block projects under 30 V.S.A. § 8005a(c)(1)(B).  We defer to the PUC's conclusion that the GMP proposals qualified as provider-block projects because Allco has not demonstrated that the PUC's interpretation of § 8005a(c)(1)(B) is either unreasonable or has compelling indications of error.

¶ 2.  We begin with a brief background on the standard-offer program.  In 2009, the Legislature established a standard-offer requirement as part of the Sustainably Priced Energy

Enterprise Development (SPEED) Program to promote the rapid development of renewable energy in Vermont. 2009, No. 45, § 4. In 2012, the Legislature made significant changes to the standard-offer program, now codified at 30 V.S.A. § 8005a. See 2011, No. 170 (Adj. Sess.), § 4. Under the program, the PUC issues standard-offer contracts for the construction of renewable energy plants that meet certain eligibility requirements, and Vermont retail electricity providers are required to buy the renewable power from selected plants at a designated price for a set period of time. 30 V.S.A. § 8005a. The program contracts will ultimately account for a cumulative capacity of 127.5 megawatts (MW) of electricity, allocated in annual statutorily designated increments. Id. § 8005a(c). A portion of each year's new capacity is reserved for plants proposed by Vermont retail electricity providers—the provider block—and the remainder is left for plants proposed by independent developers—the developer block. Id. § 8005a(c)(1)(B).

¶ 3. The PUC is directed to allocate the cumulative capacity among different categories of renewable-energy technologies, including methane derived from landfills, solar, wind power, hydroelectric power, and biomass. Id. § 8005a(c)(2). The PUC calculates avoided costs to serve as price caps for each technology category. "Avoided cost" is defined as:

> [T]he incremental costs to retail electricity providers of electric energy or capacity, or both, which, but for the purchase through the standard offer, such providers would obtain from distributed renewable generation that uses the same generation technology as the category of renewable energy for which the [PUC] is setting the price.

Id. § 8005a(f)(2)(B).

¶ 4. The PUC is authorized to "use a market-based mechanism, such as a reverse auction or other procurement tool," to fill the annual capacity if it finds that such mechanism is consistent with federal law and "the goal of timely development at the lowest feasible cost." Id. § 8005a(f)(1). Since 2013, the PUC has used a market-based mechanism, consisting of an annual request for proposals (RFP) where the lowest-priced bidders are awarded a standard-offer contract

at their bid price. See Investigation into Programmatic Adjustments to the Standard-Offer Program for 2018, No. 17-3935-INV, 2018 WL 1452283, at *1 (Vt. Pub. Util. Comm'n Mar. 16, 2018). In March 2020, the PUC decided to retain its market-based mechanism to fill the available 2020 capacity for the standard-offer program and directed the Standard Offer Facilitator, the state's purchasing agent, to issue a RFP. Investigation to Review the Avoided Costs that Serve as Prices for the Standard-Offer Program in 2020, No. 19-4466-INV, 2020 WL 1557388, at *8 (Vt. Pub. Util. Comm'n Mar. 4, 2020).*

¶ 5.     In June, GMP submitted two provider-block proposals—one for a project based in Bristol, Vermont, and the other for a project in Pittsford, Vermont. In a letter accompanying both proposals, GMP disclosed the following:

> In the interest of transparency, GMP also wishes to explain the structure underpinning its Application. GMP executed an agreement with a solar developer under which the developer assigned its interest in a Land Purchase Option for this project site. GMP thus maintains the required site control for the project. If awarded the project under the RFP, GMP intends to execute a Standard Offer PPA with VEPP Inc., also as required. Once executed, GMP then intends to assign the PPA and the Land Purchase Option to the developer who would continue on with permitting, construction, operation and all deliveries under the Standard Offer PPA. GMP would have no further involvement in

---

*     In a separately docketed appeal, In re Investigation to Review the Avoided Costs that Serve as Prices for Standard-Offer Program in 2020 (Investigation I), 2021 VT 28, __ Vt. __, __ A.3d __, Allco challenged the PUC's March 2020 decision retaining the market-based mechanism, arguing that the PUC failed to make a finding, as required by 30 V.S.A. § 8005a(f)(1), that the market-based mechanism is consistent with federal law. In addition, Allco argued that the PUC's market-based mechanism violated federal law—namely, the Public Utility Regulatory Policies Act (PURPA)—because it compelled wholesale sales of electricity at rates other than a utility's generic avoided costs, as defined by PURPA. In Investigation I, we rejected these arguments, concluding, among other things, that the PUC's market-based mechanism was consistent with PURPA. 2021 VT 28, ¶¶ 42-44.

In this appeal, Allco renews its arguments that the PUC's March 2020 decision retaining the market-based mechanism violated § 8005a(f)(1) and PURPA. Because Allco concedes that Investigation I and the present appeal present the same issues pertaining to the market-based mechanism's compliance with § 8005a(f)(1) and federal law—and the arguments made here are a reiteration of the same arguments raised in Investigation I—we decline to address those issues again here.

the project other than to receive its pro rata share of output from the project under the Standard Offer Program.

¶ 6. In July 2020, the Facilitator filed a report recommending that the PUC award contracts to the two provider-block proposals submitted by GMP. Allco filed comments, arguing that the GMP proposals were not bona fide provider-block projects because the legislative intent behind 30 V.S.A. § 8005a(c)(1)(B) indicated that a provider-block project is a utility-owned project, not a developer project proposed by a utility. Furthermore, under principles of agency law, Allco argued that GMP did not propose the project because it was acting as an agent on behalf of a principal, the undisclosed independent developer.

¶ 7. In September 2020, the PUC issued an order directing the Facilitator to make standard-offer contracts available to the two GMP proposals. In response to Allco's comments, the PUC concluded that nothing in the RFP, PUC precedent, or § 8005a(c)(1)(B) required provider-block projects to be owned and operated by a Vermont utility. The PUC noted that § 8005a(c)(1)(B) neither defines the term "proposed" nor prohibits a Vermont utility from proposing a project and engaging a third-party company to develop and operate the project. In fact, the PUC observed that in 2019, it awarded contracts to projects proposed by a utility, the Vermont Public Power Supply Authority (VPPSA), that were developed by third parties. Finally, the PUC explained that there may be reasons why it is more cost effective for a utility to rely on a third party to develop and operate a project.

¶ 8. Allco filed a motion for reconsideration. Citing legislative history—namely, testimony before the Senate Committee on Natural Resources and Energy—Allco again argued that the Legislature intended for utilities to own provider-block projects. In an order denying the motion, the PUC explained that it was declining to look to legislative history to determine the meaning of § 8005a(c)(1)(B) because legislative intent could be ascertained from the text of the statute, which provides that a portion of the annual increase in the standard-offer program "shall

4

be reserved for new standard-offer plants <u>proposed by</u> Vermont retail electricity providers." (Emphasis added.) If the Legislature had intended for utilities to own provider-block projects, the PUC reasoned, the Legislature would have said so.

¶ 9. On appeal, Allco argues that the PUC erred in concluding that utilities do not need to own provider-block projects for three reasons. First, Allco argues that legislative history confirms that the Legislature intended for utilities to own provider-block projects. Second, Allco argues that prior PUC orders demonstrate that the PUC has similarly understood that provider-block projects must be owned by utilities. Finally, Allco argues that because "GMP has admitted that it is merely acting as <u>an agent</u> for an undisclosed developer," agency principles indicate that the undisclosed developer, not GMP, is proposing the project.

¶ 10. The Department of Public Service (DPS) responds that the plain language of § 8005a(c)(1)(B) clearly demonstrates that provider-block projects are those "proposed by"—not owned by—Vermont utilities. Because the plain language of the statute is clear, DPS submits that legislative history is irrelevant. In any event, DPS argues that the clear legislative intent behind the standard-offer program is to "encourage[] renewable energy development 'with a goal of ensuring timely development at the lowest feasible cost,' " and GMP's bids were consistent with that goal because they were among the lowest priced bids submitted. Finally, DPS points out that the typical standard-offer contract permits assignment to a third party.

¶ 11. "Out of respect for the expertise and informed judgment of agencies, and in recognition of this Court's proper role in the separation of powers, we accord agency decisions substantial deference." <u>In re Conservation Law Found.</u>, 2018 VT 42, ¶ 15, 207 Vt. 309, 188 A.3d 667. That deference extends to "an agency's interpretation of a statute that [it] is tasked with interpreting." <u>In re Stowe Cady Hill Solar, LLC</u>, 2018 VT 3, ¶ 20, 206 Vt. 430, 182 A.3d 53 (quotation omitted). "[W]e will overturn an agency's interpretation of a statute if there is a

compelling indication of an error or if the interpretation is unjust or unreasonable." In re Acorn Energy Solar 2, LLC, 2021 VT 3, ¶ 23, __ Vt. __, 251 A.3d 899 (quotation omitted).

¶ 12.   According deference to the PUC's decision, we conclude that Allco has not demonstrated that the PUC's interpretation of § 8005a(c)(1)(B) is either unreasonable or has a compelling indication of error.  The legislative history Allco cites—statements by an individual legislator during a committee hearing—is of limited value in statutory interpretation.  In addition, the prior PUC precedent Allco cites does not demonstrate that the PUC has previously interpreted § 8005a(c)(1)(B) to require utilities to own provider-block projects.  Finally, Allco's reliance on agency law does not demonstrate that the PUC's interpretation of § 8005a(c)(1)(B) is unreasonable.

## I.  Legislative History

¶ 13.   In arguing that the Legislature intended for utilities to own provider-block projects, Allco cites to the following testimony of then-Representative Cheney, now a PUC Commissioner, before the Senate Committee on Natural Resources and Energy in March 2012:

> [Ms. Cheney]: The other difference [to the standard-offer program is] that we say that in each block . . . of new capacity, utilities may qualify for 2 and-a-half megawatts.  So out of each 10 megawatts, a utility could build a standard offer plant or plants up to 2.5 megawatts every year.
>
> [Representative Lyons, Chair]: Can I just ask how that—how the amount is determined that utilities would own?
>
> [Ms. Cheney]: Well it was more a judgment.  It was based on a judgment that we didn't want utilities to take up everything.
>
> . . . .
>
> But we wanted to be reasonable in allowing them to have a small proportion.

(Emphases added.)  Allco argues that this exchange demonstrates that the Legislature intended for utilities to own provider-block projects.

6

¶ 14. The legislative history Allco cites does not demonstrate that the PUC's interpretation of § 8005a(c)(1)(B) is unreasonable. It is true that if statutory language is ambiguous, we may consult "[l]egislative history, circumstances surrounding a statute's enactment, and evidence of the legislative policy at which the statute was aimed" to determine the Legislature's intent. Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215. In considering legislative history, however, the comments of individual legislators typically carry "little weight." State v. Madison, 163 Vt. 360, 373-74, 658 A.2d 536, 545 (1995) (per curiam). We are generally " 'hesitant to resort to statements of the purpose or nature of the proposed law made by committee members or other persons at the committee's hearings.' " State v. Rooney, 2011 VT 14, ¶ 39, 189 Vt. 306, 19 A.3d 92 (Skoglund, J., concurring) (alterations omitted) (quoting 2A N. Singer & J. Singer, Sutherland Statutory Construction § 48.10, at 583 (7th ed. 2007)). Moreover, the cited testimony is equivocal; it reflects an assumption that utilities would own the provider-block projects they proposed, but does not purport to address the question whether they may contract with and assign their rights to third-party developers. Representative Cheney's statements therefore do not demonstrate that the PUC's interpretation of § 8005a(c)(1)(B) is unreasonable.

## II. PUC Precedent

¶ 15. The PUC concluded that its interpretation of § 8005a(c)(1)(B)—that utilities do not need to own and operate provider-block projects—was consistent with PUC precedent because in 2019 it awarded provider-block contracts to projects that were proposed by VPPSA but developed by third parties. On appeal, Allco argues that the VPPSA projects the PUC referred to are distinguishable from the GMP projects at issue here because the VPPSA projects were beneficially owned by VPPSA. Furthermore, contrary to the PUC's conclusion that its interpretation of § 8005a(c)(1)(B) was consistent with precedent, Allco argues that the PUC's interpretation conflicts with at least two prior PUC orders: one from 2013 that implemented the 2012

7

amendments to the standard-offer program and another from 2020 that revised the pricing structure for provider-block projects. According to Allco, these orders indicate that the PUC has previously understood that utilities must own provider-block projects.

¶ 16. We decline to address Allco's argument regarding the VPPSA projects because it is not adequately briefed. In addition, the prior PUC orders Allco cites do not demonstrate that the PUC has inconsistently interpreted § 8005a(c)(1)(B).

## A. VPPSA Bids

¶ 17. In concluding that utilities do not need to own and operate provider-block projects, the PUC relied in part on the fact that it had previously awarded contracts to the VPPSA for projects that were developed by third parties. On appeal, Allco argues that the VPPSA projects do not support the PUC's conclusion because those projects were beneficially owned by VPPSA. We do not consider this argument because it is not adequately briefed. Vermont Rule of Appellate Procedure 28(a)(4) provides that arguments must cite "parts of the record on which the appellant relies." In its brief, Allco explains that its supplemental printed case contains the bids the VPPSA submitted to the PUC and other information that describes the way the VPPSA standard-offer projects were structured. The documents Allco included in the supplemental printed case, however, refer to VPPSA bids from 2015 and 2016, not the 2019 projects the PUC was referring to. There is accordingly no information in the record with which we could address Allco's argument.

## B. Prior PUC Orders

¶ 18. Allco also argues that prior PUC orders indicate that the PUC has understood, at least implicitly, that utilities must own provider-block projects. We begin with a brief review of those orders. In 2013, the PUC issued an order implementing, among other things, the provider-block program, which the Legislature created in the 2012 amendments to the standard-offer program. In the order, the PUC established a market-based mechanism for allocating the annual

8

capacity in the provider block, the size of the provider block, the application of technology allocations in the provider block, and the price paid for electricity produced by provider-block projects. Programmatic Changes to the Standard-Offer Program, Nos. 7873 & 7874, 2013 WL 840116, at *29 (Vt. Pub. Util. Comm'n Mar. 1, 2013).

¶ 19. On the price issue, the PUC explained that some comments expressed concern "about the ability of providers to 'hide' project costs in rates," meaning that utilities could include capital and operational costs associated with their standard-offer projects in the rates that electric consumers pay. Id. Although the PUC acknowledged these concerns, it explained that they were "easily addressed" by explicitly clarifying that "[a]ll capital costs and operating expenses associated with a project that accepts a standard-offer must be booked below-the-line and are not added to rate base or eligible for recovery as an expense." Id. The PUC explained that the price paid to utilities for a standard-offer project already includes operational costs and expenses:

> Under the standard-offer contract, the SPEED Facilitator will pay the provider for all kWhs produced at the contract price. The contract price is the price bid by the provider in the RFP, and, at a maximum, the avoided cost . . . . This price includes a rate of return that is intended to induce distribution utilities to propose and develop projects at the lowest feasible cost. The avoided cost also includes all expenses associated with the project, including the development costs and on-going operation and maintenance expense.

Id.

¶ 20. In February 2014, GMP filed a motion for reconsideration, asking the PUC to reconsider its decision requiring utilities to exclude capital costs and operating expenses for standard-offer projects from their rates. The PUC granted the motion, explaining that after considering the parties' comments, it was persuaded to alter its previous ruling and "permit utilities to include standard-offer projects in the Provider Block in their rates." Order re Request for Reconsideration & Implementation of the Provider Block, Nos. 7873 & 7874, 2014 WL 794194, at *4 (Vt. Pub. Util. Comm'n Feb. 20, 2014). It explained that its "concerns about the potential

9

for double cost recovery [could] be adequately addressed" by "reducing a utility's cost-of-service by the amount of the contract payments that utility receives from the SPEED Facilitator" and by requiring "any utility desiring to develop standard-offer projects [to] file a proposed accounting treatment for [PUC] review and approval that demonstrates that the utility will not realize a double recovery for any portion of the standard-offer project's construction or operation." Id. While the PUC acknowledged that its approach could potentially allow a utility to submit a bid that "was materially in excess of its anticipated costs," and result in ratepayers contributing to an above-cost project, it concluded that § 8005a did not necessarily preclude such a project. Id. at *5. It explained that it would nevertheless "continue to monitor the bids to determine whether the competitive pressures of the RFP process [were] sufficient to push bid prices close to costs." Id.

¶ 21.    In June 2020, however, the PUC revised its accounting standard for provider-block projects, requiring that provider-block proposals "include a pricing methodology that equals, and does not exceed, the anticipated costs of the proposed project." Order re Revised Accounting Standard for Provider Block Projects, No. 20-1481-INV, at 2 (Vt. Pub. Util. Comm'n June 10, 2020), https://epuc.vermont.gov/?q=node/64/149820. The PUC explained that, based on its experience, allowing a utility to bid more than its anticipated costs in the RFP was inappropriate because it could "result in excessive cost recovery by the utility and an unreasonable cost shift between the ratepayers of that utility and the ratepayers of other utilities." Id. at 1-2.

¶ 22.    Allco argues that the PUC's interpretation of § 8005a(c)(1)(B) in the order on appeal is inconsistent with these prior orders because the orders assume that utilities will own provider-block projects. "[W]e will overturn an agency's interpretation of a statute if there is a compelling indication of an error or if the interpretation is unjust or unreasonable." Acorn Energy, 2021 VT 3, ¶ 23 (quotation omitted). An interpretation that conflicts with past agency interpretations without a legitimate justification is not reasonable. See Conservation Law Found.,

2018 VT 42, ¶ 16 (noting that Court "will overturn an agency's interpretation of its own promulgated regulation . . . that conflicts with past agency interpretations of the same rule").

¶ 23.    We certainly agree with Allco that these orders establish a pricing structure based on the assumption that utilities will own provider-block projects.  But, the PUC's interpretation of § 8005a(c)(1)(B) is not inconsistent with these orders.  The PUC established a pricing structure and procedures to ensure that utilities do not earn an excess windfall on provider-block projects.  In doing so, it did not purport to say that utilities had to own provider-block projects.  In fact, these PUC orders and the PUC's interpretation of § 8005a(c)(1)(B) are entirely consistent: the PUC has procedures in place to ensure that utilities do not earn an excess windfall on provider-block projects, whether utilities own the projects or propose the projects on behalf of independent developers.

III.  Agency

¶ 24.    Finally, Allco argues that agency principles indicate that GMP, the utility, is not really proposing the project.  Allco cites to the general rule that an agent acts on behalf and subject to control of a principal.  See Restatement (Second) of Agency § 1 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control . . . .").  Because, according to Allco, GMP admitted that it is acting as an agent for an undisclosed developer, GMP is not really proposing the project—the undisclosed developer is.

¶ 25.    Although the PUC recognized that Allco raised this argument below, it did not directly address it, concluding more generally instead that Allco had not demonstrated that GMP's bids were inconsistent with the requirements of the RFP, the statute, or the PUC's prior orders.  We similarly conclude that Allco's agency argument does not demonstrate that the PUC's interpretation of § 8005a(c)(1)(B) is unreasonable.  Allco's agency argument is simply a different way of articulating its assertion that utilities must own provider-block projects and cannot work

11

with independent developers to submit provider-block proposals. As outlined above, however, the PUC concluded, based on the language and purpose of § 8005a(c)(1)(B), that utilities could work with independent developers to submit provider-block proposals, and noted that such a process might produce more cost-effective bids. In short, general principles of agency law do not indicate that the PUC's interpretation of § 8005a(c)(1)(B) is unreasonable, especially when there is no indication that the Legislature intended § 8005a(c)(1)(B) to be interpreted in light of agency principles.

Affirmed.

FOR THE COURT:

_____

Associate Justice

12